## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DeMARCO DEON WILLIAMS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case No. 11-CV-469-TCK-FHM |
| | ) | |
| CITY OF TULSA, | ) | |
| JEFFREY MICHAEL HENDERSON, and | ) | |
| RON PALMER, | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 15 and 16, 2015, this matter came on for bench trial.

## I.  Procedural History

On January 22, 2013, the Court granted summary judgment in favor of Defendant City of

Tulsa ("City") on all claims (Doc. 47.)  The only claim remaining after the Court's ruling was a 42

U.S.C. § 1983 ("§ 1983") claim asserted against Defendant Jeff Henderson ("Henderson") in his

individual capacity.  On November 13, 2013, upon leave of Court, Plaintiff Demarco Deon Williams

("Williams") filed a Second Amended Complaint ("SAC") adding a second claim for relief against

Henderson, the City, and newly named Defendant Ron Palmer ("Palmer"), pursuant to *Bosh v.*

*Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013) ("*Bosh* claim").  On June 17, 2014,

the Court held that the *Bosh* claim was barred by the statute of limitations and dismissed such claim

as to all Defendants.  The only remaining claim was again the § 1983 claim asserting that Henderson

violated Williams' constitutional rights.  On November 7, 2014, the Court denied Henderson's

motion for summary judgment on this claim.

On December 8, 2014, when the Court called the case for non-jury trial, Henderson

announced his intent to immediately appeal the Court's order denying his motion for summary

judgment, which included a ruling on qualified immunity. Williams moved to certify for interlocutory appeal the Court's prior grant of grant of summary judgment in favor of the City and the Court's dismissal of his *Bosh* claims. The Court granted Plaintiff's motion to certify. By Orders dated September 25, 2015 and October 7, 2015, the Tenth Circuit affirmed all prior rulings by this Court.

Upon remand from the Tenth Circuit, on December 15 and 16, 2105, the Court held a non-jury trial on Williams' § 1983 claim against Henderson. (SAC, First Claim for Relief, ¶¶ 70-74.) The parties submitted post-trial briefs on January 8, 2016.

## II.     Evidentiary Rulings

### A.     Meek's Testimony Regarding RCI Policy

Williams sought to admit Sergeant Gary Meek's testimony regarding Policy #31-307 ("RCI Policy") of the Special Investigations Division ("SID") of the Tulsa Police Department ("TPD") relating to registration of reliable confidential informants ("RCIs"). Defendant objected, arguing that this testimony regarding the RCI Policy was irrelevant under *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-64 (10th Cir. 2005).

Defendant's objection is overruled. *Tanberg* holds that violation of a police department's internal policy is generally irrelevant to the question of whether a constitutional violation occurred and that admitting such policy "could cause the jury to mistake violations of the [policies] for a constitutional violation." *Id.* Because the case was tried to the Court, there is no risk the Court will confuse a violation of the RCI Policy with a violation of the Fourth or Fourteenth Amendment. Further, Williams is not arguing that violation of the RCI Policy tends to show that a constitutional violation occurred in a routine case. Instead, Henderson's non-compliance with the policy is being

2

offered as circumstantial evidence supporting Williams' theory that Henderson engaged in a pattern of fabricating RCIs in affidavits for search warrant. The Court finds the evidence admissible for this purpose.

###### B.    Citizen Complaints/IA Investigations - Exhibit 6

Williams also seeks to introduce a series of citizen complaints against Henderson and their corresponding Internal Affairs ("IA") investigations as Exhibits 6a-6x. Defendant objected to all of Exhibit 6 on relevance grounds, arguing that all complaints are not substantively relevant and/or too remote in time from July 2004 events which underlie this case. During trial, the Court asked Williams to provide a list of any complaints with specific relevance to this case. Williams narrowed his request and categorized the proposed exhibits as follows: (1) vehicle searches - 6b, 6e, 6t, 6v, 6w; (2) veracity - 6f, 6i, 6l; (3) home searches - 6g, 6h, 6o, 6q, 6t; (4) false statements - 6n; and (5) theft - 6r, 6s, 6x. Williams no longer seeks introduction of Exhibit 6a, 6c, 6d, 6j, 6k, 6m, 6p, and 6u.

The Court finds the following complaints relevant because they have some bearing on whether Henderson fabricated the RCI or otherwise violated Henderson's constitutional rights: 6g (alleging Henderson threatened to plant drugs); 6i (suspension following citizen complaint; IA found, *inter alia*, that Henderson lied to dispatch about his location); 6n (alleging Henderson lied on a police report); 6q (alleging Henderson fabricated RCI in a "John Doe" search warrant); 6r (alleging Henderson stole money/property during search); 6s (alleging Henderson stole money during search); and 6x (alleging Henderson stole money during search). Although admitted, the Court has carefully considered each exhibit's evidentiary value based on whether there was a finding of responsibility, the substance of the complaint, and when it was made. The remaining exhibits, Exhibit 6b, 6e, 6t, 6v, and 6w, are excluded as not sufficiently related in substance to the current allegations.

III.    **Findings of Fact**

    A.      <u>**2004 Searches and Arrests**</u>

1.      On July 27, 2004, Henderson obtained a search warrant for a residence located in the 3800

Block of South 128th East Avenue in Tulsa, Oklahoma, which is Williams' residence.  In the

affidavit in support of the warrant request, Henderson asserted:

> YOUR AFFIANT FURTHER STATES THAT WITHIN THE PAST 72 HOURS, HE MET WITH A RELIABLE, CONFIDENTIAL INFORMANT (HEREAFTER REFERRED TO AS RCI).  THE RCI HAS IN THE PAST GIVEN INFORMATION TO YOUR AFFIANT AND OTHER LAW ENFORCEMENT AGENCIES IN EXCESS OF SEVEN OCCASIONS. ALL SUBJECTS ARRESTED SUBSEQUENT TO INFORMATION RECEIVED FROM THIS RCI HAVE BEEN SUCCESSFULLY CHARGED WITH NARCOTIC VIOLATIONS.   YOUR AFFIANT FURTHER STATES THAT THE INFORMATION THAT THE RCI HAS NEVER BEEN UNTRUE OR MISLEADING.  THE INFORMATION THE RCI HAS PROVIDED IN THE PAST HAS BEEN UP TO DATE AND VITAL ON SEVERAL NARCOTICS INVESTIGATIONS.   YOUR AFFIANT FURTHER STATES THAT THE RCI HAS SHOWN KNOWLEDGE OF THE TRAFFICKING OF NARCOTICS AND OTHER CONTROLLED DANGEROUS SUBSTANCES.

> YOUR AFFIANT FURTHER STATES THAT IN THE PAST 48 HOURS THE MENTIONED RCI HAS BEEN TO THE ABOVE DESCRIBED RESIDENCE AND OBSERVED A BLACK MALE, HEREAFTER REFERRED TO AS 'JOHN DOE' WHO WAS SELLING COCAINE OUT OF THIS RESIDENCE.   THE RCI DIRECTED YOUR AFFIANT TO THE RESIDENCE AND POINTED IT OUT AS THE LOCATION FROM WHICH THE RCI OBSERVED THE COCAINE.  THE RCI TOLD YOUR AFFIANT THAT THE COCAINE WAS PACKAGED FOR SALE.  THE RCI TOLD YOUR AFFIANT THAT THE RCI HAS OBSERVED JOHN DOE CONDUCT DRUG TRANSACTIONS FROM THIS RESIDENCE. THE RCI DESCRIBED THE COCAINE TO YOUR AFFIANT AND THAT THE RCI IS POSITIVE THAT THE ITEMS SEEN IN THE RESIDENCE WERE INDEED COCAINE.

> . . .
> YOUR AFFIANT FURTHER STATES THAT JOHN DOE TOLD THE RCI THAT HE IS ONLY SELLING COCAINE AFTER THE HOURS OF 10 P.M.

(Pl.'s Ex. 3.)

The Court finds by a preponderance of the evidence that Henderson fabricated the RCI mentioned in the above-quoted affidavit for search warrant. This conclusion is based on Henderson's criminal convictions for perjury discussed below in *United States v. Henderson*, 10-CR-117-BDB; Judge Payne's finding that Henderson fabricated another RCI and lied about it during a post-conviction evidentiary hearing; the sheer volume of "John Doe" search warrants based upon information allegedly provided by unregistered RCIs sought by Henderson from May to December of 2004 (Pl.'s Ex. 5); similar citizen complaints against Henderson (*see, e.g.,* Pl.'s Ex. 6q); and Henderson's unreliable testimony in this case.  Henderson relies on his repeated discovery of contraband to establish that the RCIs must have actually existed.  However, this does not convince the Court that the RCIs existed.  Instead, it convinces the Court that Henderson was hearing accurate rumors about drug trafficking at various residences and then trumping up affidavits in support of his search warrants.

2.      Upon search of Williams' residence, police found 120 grams of cocaine base and a firearm. Williams was in the residence at the time of the search.  The Court finds that Williams possessed this cocaine with intent to distribute and had been attempting to dispose of it in the sink prior to the officers' entry.  The Court does not believe Williams' testimony that the cocaine was possessed only by Ted Ford ("Ford"), who was staying with Williams, or that Williams lacked knowledge that the cocaine was present in his home.  Williams was effectively impeached with inconsistencies between his testimony during this trial and his criminal trial.  During this trial, Williams testified he did not know about the drugs until they were found.  During his criminal trial, Williams testified he knew about the drugs in the house but that they were not his.

3.      While at the police station on July 27, 2004, Williams signed a confession containing facts that he admitted to Henderson.  The Court does not believe Williams' testimony that he signed a blank confession that was later completed by Henderson.  In addition to Henderson, Sergeant Luke Sherman ("Sherman") was present during this interview.  Sherman testified that Williams admitted his conduct and signed a completed statement rather than a blank form.

4.      Williams agreed to cooperate with Henderson and work as an informant, and Henderson used the signed confession as collateral to ensure his cooperation.  When Henderson was unable to reach Williams by cell phone a few days later, Henderson decided Williams was no longer willing to be an informant.  Henderson then started the paperwork for TPD to issue a warrant for Williams' arrest based on the drugs, firearm, and signed confession.

5.      On September 24, 2004, TPD issued an arrest warrant for Williams based on, *inter alia*, a finding of probable cause that Williams was trafficking illegal drugs.

6.      On October 5, 2004, Henderson was on his way to testify at the Tulsa County Courthouse. Henderson noticed Williams and Ford sitting in Williams' vehicle, which was parked illegally at 1300 North Denver Avenue.  Henderson did not know whether a warrant had yet been issued for Williams' arrest and checked with dispatch.  Upon learning of the arrest warrant, Henderson called for backup.  Officer Thompson came to the scene.  Both officers ordered Williams out of the vehicle and arrested him.

7.      Henderson searched the vehicle and found cash, scales, and more than 50 grams of cocaine base in a shaving kit between the front seats.

8.      While at the police station, homicide detective Roger Smith ("Smith") questioned Williams in connection with an ongoing homicide investigation.  Smith *Mirandized* Williams, and Williams signed an acknowledgment of his rights.  Although Smith was questioning Williams for purposes of a homicide investigation, Williams confessed to being fronted the large quantity of drugs found in his vehicle on that date.  He also confessed to possessing the drugs and firearm found in his residence.  Williams did not mention Ford or claim that the drugs belonged to Ford.  Smith memorialized Williams' confession in an "Officer Summary" and then gave the report to drug detectives.  Smith was a credible witness who obtained a confession from Williams.  The Court has no reason to question the veracity of his testimony or his summary of Williams' second confession on October 5, 2004.

**B.      Williams' Prosecutions**

9.      On October 7, 2004, a federal grand jury indicted Williams for drug trafficking and gun charges.  *See United States v. Williams*, 04-CR-67-HDC ("04-CR-67").  On October 25, 2005, almost one year after the Superseding Indictment was filed, Williams was convicted of all four counts in 04-CR-167.  United States District Judge Dale Cook sentenced Williams to life imprisonment without the possibility of parole.  The Tenth Circuit reversed the convictions based on violations of the Speedy Trial Act, 18 U.S.C. § 3161 *et. seq.*, and ordered the district court to determine whether to dismiss the case with prejudice or without prejudice.  *United States v. Williams*, 511 F.3d 1044 (10th Cir. 2007).  Judge Cook dismissed the case without prejudice.

10.      On February 6, 2008, Williams was indicted on the same four counts.  *See United States v. Williams*, 08-CR-21-CVE ("08-CR-21").  This case was assigned to United States District Judge Claire Eagan.  Henderson testified in a suppression hearing and during trial.  The Court finds that

Henderson testified falsely regarding the existence of an RCI.  The Court finds that Henderson testified truthfully that he found drugs in Williams' residence and vehicle.

11.     On April 25, 2008, a jury convicted Williams of Counts 1, 3, and 4, and acquitted Williams of Count 2.  Judge Eagan sentenced Williams to life imprisonment as to Count 1 (drugs found in residence) and Count 4 (drugs found in car) and 120 months as to Count 3 (firearm found in residence), with all sentences to run concurrently.  Williams' direct appeals and request for certiorari were denied.

12.     In March 2010, the United States moved to vacate Williams' conviction and sentence in 08-CR-21 and set the matter for new trial.  Judge Eagan granted the motion and set the matter for new trial.  The United States elected not to retry the case and moved to dismiss the Indictment.  Judge Eagan dismissed the Indictment and ordered Williams to be released from prison on April 30, 2010.  Williams had been in continuous custody since October 5, 2004.  Williams served over six years in a maximum-security federal prison.

### C.     Henderson's Perjury Convictions and Contempt Citation

13.     On July 20, 2010, Henderson was indicted for more than 50 offenses, including drug charges, firearms charges, civil rights charges, and perjury charges.  (*See United States v. Henderson*, 10-CR-117-BDB, Doc. 2.)  On August 25, 2011, Henderson was convicted of six counts of perjury (Counts 47, 50-52, 54-55), in violation of 18 U.S.C. § 1621(1), and two counts of deprivation of civil rights, in violation of 18 U.S.C. § 242.  (*See* 10-CR-117, Doc. 346.)  The deprivations of civil rights were unreasonable searches and seizures of Carah Bartel and William Kannard occurring on February 12, 2008 (Count 39) and of Ronald Crawford ("Crawford") on January 12, 2009 (Count 45).  The perjury convictions all stem from Henderson's testimony during a suppression hearing in *United States v.*

*Ronald Crawford*, 09-CR-26-CVE.  In that case, Henderson testified that he conducted surveillance of a house on January 5 and 6, 2009, saw Crawford going back and forth from the house to a car, and then provided that information in an affidavit for search warrant.  At Henderson's criminal trial, the United States presented evidence that Crawford was in Arlington, Texas on January 5 and 6, 2009.  Cell tower data refuted that Henderson's phone was near Crawford's house when he claimed to have been conducting surveillance on Crawford's house.  The jury believed Henderson lied in the affidavit for search warrant and testified falsely in the suppression hearing before Judge Eagan.

14.     In 2011, a convicted federal prisoner, Tony Becknell ("Becknell"), filed a motion for post-conviction relief challenging whether Henderson fabricated the RCI identified in certain affidavits for search warrants that led to his conviction.  In June 2012, United States District Judge James Payne conducted an evidentiary hearing on the post-conviction motion.  During this hearing, Henderson unequivocally identified the RCI by name and physical description.  However, Judge Payne later concluded the testimony was "proven to be completely false" because "the RCI named by Henderson was incarcerated during the time period encompassing the Becknell search warrants." (*See United States v. Becknell*, 05-CR-84-JHP, Doc. 189.)  When ordered to show cause why he should not be held in contempt, Henderson contended he made a mistake but did not intentionally lie.  Judge Payne disagreed and held Henderson in contempt of court:

> This outcome of this contempt proceeding is contingent on the credibility of Henderson.  This Court has now had the opportunity--just as the judges and jury in Henderson's criminal case--to see just how earnest and persuasive Henderson can be when he is testifying, even testifying falsely.  This Court finds that Henderson testified falsely in his June 29, 2012, testimony.  He now readily admits the falsity, but only after being confronted with documentary evidence that his testimony was false.  And this Court also finds that Henderson testified falsely with intent to obstruct the administration of justice.  It was not an inadvertent mistake.  After observing and listening to Henderson during both hearings, the Court does not believe Henderson's

9

testimony that he made an honest mistake about the identity of the RCI.  Henderson had no equivocation in his testimony on June 29, 2012.

The record before the Court, as well as the observations by the Court concerning Henderson's credibility, demonstrate that Henderson either, with knowledge of its falsity or with reckless disregard for it truthfulness, offered false testimony to this Court.  As a result, it is the Finding and Order of this Court that Jeff Henderson is in contempt of this Court's order directing his truthful testimony.

(*Id.*)  On July 20, 2012, Judge Payne released Becknell from custody.

## IV.    Conclusions of Law

1.    Williams' § 1983 claim against Henderson premised upon his unlawful imprisonment falls "under the rubric of malicious prosecution" and was timely filed.  *See Williams v. City of Tulsa*, 627 F. App'x 700, 703 (10th Cir.  2015).[1]

2.    Section 1983 provides a federal civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution" by any person acting under color of state law.  42 U.S.C. § 1983.  The general elements of a § 1983 claim are: (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a person (4) who acted under color of any statute, ordinance, regulation, custom, or usage, of any state.  *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002).  With respect to recoverable damages, "the abstract value of a constitutional right may not form the basis for § 1983 damages." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986).  Instead, the purpose of § 1983 damages is to compensate for actual injuries caused by the deprivation of constitutional rights.  *Id.*

---

[1]  Any "stand-alone" Fourth Amendment violation for the illegal search of his house was not timely filed.  *See id.* at 703 n.4 ("To the extent Mr. Williams may seek redress for the stand-alone violation of his Fourth Amendment rights relating to the search of his home per se, distinct from any subsequent detention based thereon, that claim is presumed to have accrued when the actions actually occurred.") (internal alterations and quotation omitted).

3.	"The analysis in a § 1983 case begins with the identification of the precise constitutional rights infringed." *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011). Here, Williams seeks § 1983 damages under a theory of malicious prosecution premised upon violation of (1) his Fourth Amendment right to be free of unreasonable seizure, and/or (2) his Fourteenth Amendment right not to be deprived of liberty without due process of law. Both theories are permissible. *See Myers v. Koopman*, 738 F.3d 1190, 1193-95 & n.3 (10th Cir. 2013) (discussing both types of § 1983 "malicious prosecution" claims and requirements of each); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). The parties both framed their trial evidence, trial arguments, and post-trial briefs in this manner. Any non-conformance with the SAC or Pretrial Order has been waived. Any contrary reasoning by this Court in prior orders is superseded by these Conclusions of Law.[2]

---

[2] In its ruling on the City's motion for summary judgment, the Court classified this claim as arising solely under the Fourteenth Amendment in order to deem it timely. (*See* Doc. 47 at 13-14.) The court relied upon the following from *Mondragon v. Thompson*, 519 F.3d 1078,1083-84 (10th Cir 2008):

> In summary, two claims arise from an allegedly unconstitutional imprisonment as analysis "shifts" from the Fourth Amendment to the Due Process Clause. The period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment. That claim accrues when the plaintiff is released or legal process is instituted justifying that imprisonment. The period of time between the institution of that process and its favorable termination—through acquittal, habeas corpus, voluntary dismissal, etc.—forms a second claim, arising under the Due Process Clause. That claim accrues, at the earliest, when favorable termination occurs.

Cases after *Mondragon*, including *Wilkins* and *Myers,* indicate that there can indeed exist a "Fourth Amendment malicious prosecution claim" that continues even after the institution of legal process. There was no need for the Court to construe the claim as arising under the "Fourteenth Amendment" in order to deem it timely. Instead, the Court need only have clarified that the § 1983 claim was akin to malicious prosecution instead of false imprisonment. These Conclusions of Law supersede any contrary reasoning in the Court's prior Orders indicating that any "Fourth Amendment" claim is untimely.

4.      Whether premised upon a Fourth or Fourteenth Amendment violation, the "constitutional tort of malicious prosecution requires the plaintiff to prove lack of probable cause." *Id.* at 1285-86.  The substance of probable cause is a reasonable ground for belief of guilt.  *Id.* at 1286.  "Probable cause exists if the facts and circumstances are sufficient to warrant a person of reasonable caution to believe a crime has been committed."  *Id.*  "If evidence is falsified or withheld, the probable cause determination is made by considering whether, excluding the falsified inculpatory evidence or including the withheld exculpatory evidence, probable cause existed to prosecute."  *Id.*

5.      Williams' § 1983 malicious prosecution claim fails based on the existence of probable cause for his October 5, 2004 seizure and all prosecution thereafter.  Excluding all of Henderson's false statements regarding the RCI, there still existed ample evidence to seize and prosecute Williams.  This evidence included the large quantities of drugs found in Williams' residence and vehicle and the two validly obtained confessions.

6.      Williams argues that, in making its probable cause determination, the Court must exclude any evidence uncovered during the illegal search of his residence on July 27, 2004 and anything else that was "fruit of the poisonous tree."  Specifically, Williams argues that "any alleged evidence recovered pursuant to a falsified search warrant is excluded under Oklahoma law, and any evidence garnered from a falsified search warrant should be excluded when considering whether probable cause existed to" initiate or continue prosecution against him.  (Post-Trial Br. 3.)  Williams relies upon Oklahoma law holding that the exclusionary rule applies in civil proceedings as well as criminal proceedings.  *See Turner v. City of Lawton*, 733 P.2d 375, 381 (Okla. 1986) (explaining that Oklahoma's exclusionary rule is broader than federal counterpart and extends to civil proceedings).

12

7.      Williams' argument is flawed because federal law interpreting § 1983, and not Oklahoma law, governs this legal issue.  Although state law can provide "guideposts" for evaluating constitutional torts, the ultimate question is always whether a federal constitutional violation occurred.  *See Pierce v. Gilchrist*, 359 F.3d 1279, 1288 (10th Cir. 2004) ("It would be odd to interpret a statute, § 1983, which was enacted during Reconstruction to provide a federal remedy for violations of civil rights . . . as simply incorporating the law of the states as a standard for evaluating the federal constitutional claims.").  Where Oklahoma law and federal § 1983 law conflict, Oklahoma law ceases to be helpful to the Court in analyzing the § 1983 claim.

8.      Federal courts have concluded that § 1983 civil claimants are not entitled to the benefit of the exclusionary rule.  In *Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016), the court explained:

> We now join our sister circuits and hold that the exclusionary rule does not apply in a civil suit against police officers. The cost of applying the exclusionary rule in this context is significant: officers could be forced to pay damages based on an overly truncated version of the evidence. And the deterrence benefits are minuscule. Police officers are already deterred from violating the Fourth Amendment because the evidence that they find during an illegal search or seizure cannot be used in a criminal prosecution—the primary "concern and duty" of the police.  Moreover, plaintiffs can still sue a police officer for the illegal search or seizure, regardless whether the officers can rely on illegally obtained evidence to defend themselves against other types of claims. This threat of civil liability will adequately deter police officers from violating the Fourth Amendment, whether or not the exclusionary rule applies in civil cases.  The "additional marginal deterrence" of applying the exclusionary rule in this context "would not outweigh the societal cost of excluding relevant evidence and decreasing the possibility of obtaining accurate factual findings."  And we see no difference between applying the exclusionary rule and preventing an officer from proving probable cause based on evidence obtained during an illegal search. "Exclusion of the evidence found by [the officers] on the basis that they had no legal right to search the [area] would, in effect, be an application of the exclusionary rule to this case. Such an application would be inappropriate." Accordingly, the officers can rely on the evidence that they found in the [illegally searched] trailer to prove that the arrest warrants were supported by probable cause.

13

(citations omitted); *see also Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir. 1999) ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir.1997).

Thus, notwithstanding the illegal search, the contraband found and the confession made on July 27, 2004 provided probable cause for a validly issued arrest warrant. The validly issued arrest warrant provided probable cause for the October 5, 2004 arrest. The search of Williams' vehicle pursuant to arrest led to a second valid confession to Smith, a homicide detective with no substantial connection to Henderson. The contraband discovered and two valid confessions provided probable cause for Williams' prosecution and six years of imprisonment. Any misstatements by Henderson during the suppression hearing or trial regarding the RCI were not sufficient to vitiate the remaining probable cause for his prosecution. Accordingly, Williams' Fourth and Fourteenth Amendment rights were not violated for purposes of a § 1983 malicious prosecution claim.[3]

9.      The Court views Williams' situation much like the plaintiff's situation in *Townes*. There, the § 1983 plaintiff had illegally possessed firearms and narcotics but was the victim of an unlawful search and seizure. He had already "reaped an enormous benefit by reason of the illegal seizure and search . . . his freedom." *Id.* at 148. The court reasoned that "damages compensat[ing] him for his conviction and time served . . . . would vastly overdeter police officers and would result in a wealth

---

[3] Williams' Fourteenth Amendment claim likely also fails due to the existence of an adequate state remedy. *See Myers*, 738 F.3d at 1193 ("If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy—such as a state tort claim—will satisfy due process requirements."). However, this argument was not raised during trial or in the post-trial briefs, and the Court disposes of the Fourteenth Amendment theory based on the existence of probable cause for Williams' prosecution.

transfer that is peculiar, if not perverse." *Id.* (internal quotations omitted).  Here, a constitutional violation did occur -- namely, an unreasonable search in violation of the Fourth Amendment.  But without the benefit of the exclusionary rule and the fruit of the poisonous tree doctrine, which are not available in this § 1983 action, no further constitutional violation occurred.  Williams' seizure/imprisonment were not wrongful and his prosecution was not malicious due to the existence of probable cause.  This is not an inequitable result because Williams already reaped the benefit of being released from prison.  In short, this is not a case of actual innocence or wrongful imprisonment, and the Court finds no reason to compensate Williams for the six years he served.

10.     Williams has also failed to prove that Henderson's conduct caused the damages he suffered as a result of imprisonment.  In § 1983 cases, "a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability."  *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006).  Even if a factfinder concludes that a residential search is unlawful, officers are only liable for harm that they proximately or legally cause by their tortious conduct.  *Id.*  Therefore, they are not necessarily liable "for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  *Id.*  Instead, they are only liable for reasonably foreseeable consequences of their actions. *Id.* at 1047.

In this case, there is at least one superseding cause of Williams' imprisonment that broke the chain of causation started by Henderson's fabrication of the RCI: Williams' detailed confession to Smith.  While Henderson's fabrication of the RCI was a "but for" cause of Williams' ultimate imprisonment in that it started the entire chain of events, Henderson could not have reasonably foreseen that his unlawful search would result in Williams confessing to a homicide detective that he possessed with intent to distribute drugs found in his vehicle over four months later.  Williams'

term of imprisonment for Count 4 (drugs found in vehicle) ran concurrently to Counts 1 and 3, and Count 4 alone justified the six years of imprisonment.  Accordingly, the Court alternatively finds that Henderson's conduct was not a proximate cause of the damages Williams seeks.

## V.     Conclusion

Defendant's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on Plaintiff's claim that Henderson violated his Fourteenth Amendment rights, which was made orally at trial, is denied.[4]

Considering all evidence, the Court enters its verdict in favor of Defendant Jeffrey Michael Henderson and against Plaintiff DeMarco Deon Williams.  The Court will enter a separate judgment.

**SO ORDERED** this 19th day of April, 2016.

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**

---

[4] In his post-trial brief, Defendant states that he moved for judgment on the § 1983 Fourth Amendment claim.  However, Defendant referenced the § 1983 Fourteenth Amendment claim during his oral argument.